Filed 6/24/21  P. v. Pope CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E073703 |
| v. | (Super.Ct.No. FVI1400598) |
| ROBERT JEROME POPE, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Michael Camber, Judge.  Affirmed.

Jennifer Peabody, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Michael Pulos and Seth M. Friedman, Deputy Attorneys General, for Plaintiff and Respondent.

It was widely known among family and friends that there was "bad blood" between defendant and appellant Robert Jerome Pope and Ernie Sanders, Jr. (the victim). On January 28, 2014, around 10:00 p.m., the victim was shot to death when he answered a knock at his apartment door. The shooter entered the apartment and also shot S.M., the victim's girlfriend. S.M. survived and identified defendant as the shooter. A jury subsequently convicted him of first degree murder (Pen. Code, § 187, count 1) and attempted premeditated murder (Pen. Code, §§ 664, 187, count 2), and found true the allegations that he personally and intentionally discharged a firearm causing death in count 1 and great bodily injury in count 2 (Pen. Code, § 12022.53, subds. (b)-(d)). The trial court sentenced defendant to state prison for a total term of 52 years to life.

On appeal, defendant contends: (1) the trial court erred in failing to declare a mistrial after a detective testified that a witness had indicated he was "aware" that defendant shot his cousin; (2) the prosecutor committed misconduct during closing argument by asserting there was no evidence that someone besides defendant was the shooter; (3) CALCRIM No. 315, an instruction to the jury, is unconstitutional; and (4) the cumulative effect of the asserted errors mandates reversal. We affirm.

I. PROCEDURAL BACKGROUND AND FACTS

A. *Background Information.*

Defendant and the victim, cousins through marriage, had an ongoing feud. In late December 2013, S.M. and the victim went to a gathering at his aunt's house, where defendant called the victim "a bitch" and "hit" him. The two fought until someone told them to "take it outside." As the victim walked outside, defendant swung a beer bottle at

2

him.  The two fought again until S.M. "grabbed" the victim and said, "Let's go."  In mid-January 2014, the victim encountered defendant at a liquor store, and the two exchanged words.  The victim said that he was "right there if [defendant] had a problem."  In response, defendant stated that the victim "had bigger problems, a bigger problem was coming."

*B.  The Shooting.*

On January 28, 2014, the victim and S.M. were watching television in the living room of their Apple Valley apartment.[1]  Around 10:00 p.m., there was a knock on the door.  The victim asked who was there but received no response.  He covered S.M. with a blanket, opened the door, and encountered defendant, who was wearing a black hooded sweatshirt.[2]  Defendant had the hood on his head, with his dreadlocks sticking out.  The two stared at each other for a few seconds, and defendant shot the victim in the head, chest, and buttocks.  After the victim fell to the floor, defendant entered the apartment.  S.M. covered herself with the blanket, and defendant shot her in the chest and buttocks before fleeing.

S.M. left the apartment and screamed for help.  She shouted, "'He's dead.  He's dead.  He killed him.'"  The apartment manager called 911.  The 911 operator asked S.M.

---

[1]  They lived in a small, one bedroom apartment; they slept in the living room because S.M.'s two children slept in the bedroom.

[2]  Q.S. lived with defendant's cousin in an apartment, which is located close to the victim's apartment.  Q.S. testified that earlier that evening, defendant was at his apartment with defendant's cousin, and defendant asked for a ride.  Defendant was wearing a black hooded sweater and brown gloves.

3

if she knew who the shooter was, and S.M. replied, "J Biggs.  J Biggs.  [¶] . . . [¶]  JB.  JB."  S.M. knew defendant as "J Biggs."  S.M. was airlifted to a hospital for treatment, but one bullet remains in her pelvic bone.  At the hospital, she was shown a picture of defendant, whom she identified as the shooter.  The male victim died from his gunshot wounds.

### C.  Defendant's Arrest and Incarceration.

Shortly after the shooting, defendant was seen running past a nearby apartment complex; then he disappeared.  It took the police two weeks to locate and arrest him.  Because defendant's mother provided conflicting information about his location, deputies obtained a warrant and placed a tracker on her vehicle.  Using the tracker, they found defendant hiding out in a house in Los Angeles.  He had cut off his dreadlocks, and his hair was short.

While in custody, defendant was placed in the same housing unit as J.T., a career criminal and gang member.  According to J.T., defendant approached him and said he had been arrested for murder, but defendant believed he would get out.  J.T. opined that defendant "wanted to act like a gangster and be cold blooded and talk about how he killed somebody and bragged about it."  Defendant said he drove from Los Angeles with his girlfriend and another man to Victorville, went to an apartment, knocked on the door and, when a male answered, he "shot him point blank."  J.T. "believed" defendant shot the man because of "some type of argument."  After shooting the man, defendant said he "went inside . . . the apartment, . . . looking for the female [who] was lying face down trying to, like, I guess, brace for something, and he shot her" because "she was a

4

witness." Defendant told J.T. he shot the man three times and the woman two times. Afterward, defendant said he left the area, dumped a .38-caliber chrome revolver in the Cajon Pass, and cut off his "dreads." J.T. denied that he wanted or received any leniency for the information he had provided; he was convicted of murder and robbery and sentenced to 93 years to life.

Sergeant Walker interviewed J.T. Walker did not know J.T., had no say in his placement in the jail, and did not promise him anything in exchange for his statement. According to Walker, none of the press releases detailed the type of weapon used, the number of shots fired, the layout of the apartment, the location of the victims at the time they were shot, if defendant cut his hair after the shooting, or if he had fled to Los Angeles.

### D. The Defense.

Defendant presented an alibi defense, claimed that S.M. incorrectly identified him, and said J.T. was lying. Defendant's alibi witnesses were his mother, his father, and his fiancée. Defendant's mother testified that on January 28, 2014, defendant was at her Apple Valley home all day, except when she dropped him off at a friend's house while she went to her younger son's school—defendant did not have a driver's license—and when they picked up his fiancée and her children around 6:00 or 6:30 p.m.[3] Defendant's mother stated they ate dinner after 7:00 p.m., watched television, and then went to bed.

---

[3] At a prior proceeding, defendant's mother testified that she never took defendant to a friend's house, but she had told deputies that she dropped defendant off at his friend's house around 11:00 a.m. and did not see him again until 6:00 p.m.

Defendant's mother said she watched television with defendant, his fiancée and her children in the den (where they slept). She fell asleep around 8:00 p.m., but around 9:45 p.m., she got up and went to her bedroom. Later in the night, defendant's father answered his phone and briefly left the bedroom. Defendant's mother got up at 4:30 a.m. and went to the den to speak to defendant about the phone call. By 5:30 a.m., defendant was gone, and his mother did not see or speak with him until after his arrest.

Defendant's father confirmed he received a phone call after he had gone to bed on the night of January 28, 2014. His nieces called him; one niece was hysterical. Because of the conversation, defendant's father was "upset," "angry," and "concerned." He left the bedroom to check on defendant. After he saw two adults and two children in the den, defendant's father returned to his bedroom and exclaimed, "'Tell the fucking police to come to my house.'" He did not wake up defendant or defendant's fiancée. He explained everything to defendant's mother and went back to sleep. When defendant's father spoke to Sergeant Walker on January 29, he stated that he had not spoken to defendant since 7:30 or 8:00 p.m. the night before. Defendant's father did not tell the sergeant that he had seen defendant in the den after receiving the phone call from his nieces because the sergeant "never asked."

Defendant's fiancée confirmed that she and her children were picked up by defendant's mother and defendant around 6:00 or 6:30 p.m. on January 28, 2014, and they went to defendant mother's home. After dinner, she, her children, and defendant watched a movie—without his mother because she had already gone to bed—and they fell asleep after 9:00 p.m. She stated that she woke up when defendant's father turned on

6

the hall light and said defendant's name. Defendant replied, "[H]uh?," but did not wake up. Defendant's fiancée woke up at 7:00 a.m., but defendant was gone. When interviewed, she did not tell deputies that she had woken up after initially going to sleep. She explained that she was referring to "the period after [defendant's] dad came and turned on the light." She admitted that it was "pretty common" for defendant to "slip out into the night and leave the house without [her] knowledge."

*E. Rebuttal.*

Sergeant Flores interviewed defendant's mother on January 29, 2014. Defendant's mother said she dropped defendant off at a friend's house and did not see him until 6:00 p.m.; she went to bed at 8:00 p.m.; defendant's father received a phone call around 11:00 or 11:30 p.m.; and "even if she knew where [defendant] was, she wouldn't tell [him]." Sergeant Flores also interviewed defendant's fiancée, who did not mention that defendant's father came into the den and woke her or defendant.

Sergeant Walker interviewed defendant's father, who never said that defendant had been home when his nieces called. When Walker asked defendant's father for his thoughts on whether defendant had anything to do with the shooting, he replied: "'I don't know if he had nothing to do with it. I can't say that.' . . . 'I can't say that, but he ain't talked. He ain't been here. But he knows you guys are looking for him, I bet you that.'"

7

## II.  DISCUSSION

### A.  Mistrial.

Defendant contends the trial court abused its discretion when it denied his motion for a mistrial based on a detective's volunteered statement that a witness had indicated he was "aware" defendant shot his cousin.  We disagree.

#### 1.  Further background information.

On the day after the murder, Detective Faylor[4] contacted a man named M.B. in front of his apartment, which is located in the same general area as the victim's apartment.  At trial, on October 25, 2018, M.B. testified that he did not recall speaking with Detective Faylor.  M.B. did not recall telling the detective he had seen defendant run past his apartment on the night of the murder and denied seeing defendant in the possession of a revolver.  M.B. explained that he "was a heavy addict of PCP and [his] memory is kind of shot."  However, M.B. also admitted he did not want to be in court testifying.  At that time, M.B. was incarcerated with charges pending, and he had just been informed by his attorney that the district attorney's office would not make a "deal" or reduce his charges in exchange for his testimony.

Immediately following M.B.'s testimony, Detective Faylor testified about his interview with M.B.  According to the detective, M.B. stated he knew defendant, he had seen defendant in the possession of a six-shot revolver, and defendant ran past his

---

**4**  We note there were two officers with the same last name to testify and participate in the investigation.  We are referring to Detective Bryan Faylor throughout this opinion.

8

(M.B.'s) apartment on the night of the murder around 10:15 p.m.  Defense counsel objected to the following specific exchange:

"[THE PROSECUTOR:]  Now, when you made contact with [M.B.], what did you ask him?

"[DETECTIVE FAYLOR:]  He was standing in front of his apartment.  I contacted him, asked him if he had seen or heard anything in the area from the night prior.

"Q  And specifically what did he tell you . . . ?

"A  [M.B.] told me that he was *aware of* the murder that had happened in the neighborhood.  He told me that he was *aware of the family involved as well as the alleged shooter* at the time.  He was friends with the family.  He told me that he was *aware J Biggs had shot his own cousin the night before*.

"Q  So he told you that he knew somebody by the name of J Biggs?

"A  Yes, he did.

"Q  Did [M.B.] tell you whether or not he saw J Biggs—

"[DEFENSE COUNSEL]:  Your Honor, I'm going to move to strike all of that.

"THE COURT:  Based on?

"[DEFENSE COUNSEL]:  Speculation and hearsay, hearsay declarant.  Hearsay declared by the declarant, if that makes sense, repeat by the declarant.

"THE COURT:  Overruled."

At the conclusion of Detective Faylor's testimony, defense counsel moved for a mistrial on the grounds the evidence amounted to inadmissible "hearsay of the most gross prejudicial nature" because anyone who heard it would "assume that the witness who was

9

being quoted had information regarding the identity of the shooter that's not available to the jury." When asked whether the statement came in "as an inconsistent statement," defense counsel replied, "No. The statement is in because it was simply volunteered by the witness."[5] The prosecutor maintained that the statement was admissible as a prior

**5** The following exchange occurred: "[DEFENSE COUNSEL]: If the evidence in this case is clear about anything, it is clear and abundantly clear and indisputably clear that there was only one eyewitness to this shooting who survived, [S.M.] And yet this witness just quoted the previous witness [M.B.] as saying he knew that J Biggs had murdered his cousin . . . . [¶] Now, that can only have come from quoting other people since there isn't the slightest evidence that he saw . . . or heard anything having to do with that shooting. . . . [¶] If anything is hearsay, that's hearsay. And that's hearsay of the most gross prejudicial nature. Anybody hearing that would assume that the witness who was being quoted had information regarding the identity of the shooter that's not available to the jury; that he had specific information from somebody who knew. [¶] . . . [¶] And there's no way to unring that bell.

"THE COURT: Well, all right. So the statement came in as an inconsistent statement; right?

"[DEFENSE COUNSEL]: No. The statement is in because it was simply volunteered by the witness. Nobody asked him about it. Nobody ever asked [M.B.] if he told the police officer that he knew this person killed his cousin, which is an absolute prerequisite for making it a prior inconsistent statement.

"THE COURT: So I guess my question would be: Is the statement that the officer reported in his report?

"[DEFENSE COUNSEL]: Yes, sir.

"THE COURT: [Mr. Prosecutor], do you wish to be heard?

"[THE PROSECUTOR]: Yes, your Honor. [¶] I do believe based on the fact that [M.B.], when he was on the stand, said that he couldn't remember talking to any deputies, detectives, et cetera back at the time of this shooting, his statements were then inconsistent, and we had to impeach him with Detective Faylor. As a result, I do believe that everything that Detective Faylor testified to was impeachment of [M.B.] And if [defense counsel] feels that this one particular statement about what [M.B.] told . . . Detective Faylor is prejudicial, there could always be a curative instruction, but I don't think that it rises to the level of a mistrial in any way, shape, or form.

"[DEFENSE COUNSEL]: . . . That is not a prior statement describing anything. That is a statement saying that I, [M.B.], have knowledge that [defendant] murdered his cousin. There's . . . nothing in there indicating where he got this knowledge or why he has it or why he believes it or any other reason. Had he been confronted with that, we

*[footnote continued on next page]*

inconsistent statement, and he added that if the defense felt the "one particular statement" was prejudicial, "there could always be a curative instruction, but I don't think that it rises to the level of a mistrial in any way, shape or form." The trial court denied the motion for mistrial.

On the next court day, the trial court revisited the issue and found that Detective Faylor's testimony "detailing his interview with [M.B.] was [an] admissible, prior inconsistent statement." However, the court found no foundation for the statement: "'He was aware that J Biggs shot his own cousin the night before.'" Thus, the court stated it would sustain defense counsel's objection and strike that sentence under Evidence Code section 352. The court explained: "There's no foundation presented for the statement of how [M.B.] would know that [defendant] shot his cousin the night before. Thus, the probative value of that statement is limited. It's clearly extremely prejudicial as it deals with the primary issue in the case. So based on that, the Court finds that the statement should have been stricken because it was substantially more prejudicial than probative . . . . As it stands, the last sentence of the answer is stricken. Therefore, it can't be used in argument by either side and it won't be part of read back."

---

might have a different issue here. I would have objected to it, and it probably would have solved the problem then. [¶] But now a curative instruction is asking people, Gee, I'm instructing you not to think about the word 'elephant' for the next hour. As Justice Potter Stewart once put it: It's a routine instruction to perform a psychologically impossible feat. So I don't think that there's any way to solve this problem other than to declare a mistrial.
    "THE COURT:  Anything else?
    "[DEFENSE COUNSEL]:  Submit.
    "THE COURT:  Motion is denied."

11

When the trial court asked defense counsel if he wanted a "limiting instruction" or for the court to "detail the ruling" to the jury, defense counsel declined, stating that it would "simply reemphasize the problem." The court then stated: "[T]he following sentence will be stricken: 'He told me that he was aware that J Biggs had shot his own cousin the night before.'" Both sides agreed they understood the ruling.

Later, prior to instructing the jury, the trial court reiterated that the testimony had been stricken, was not to be referenced during closing argument, would not be part of any readback, and no instruction would be given at defense counsel's request. Defense counsel exclaimed, "Understand. I'm not conceding that this cures the error." The court replied, "I understand. Your record's clean on that."

On the second day of deliberations, the jury asked for a readback of M.B.'s testimony. After receiving the readback, the jury asked for a readback of Detective Faylor's testimony on "10/25/18 [¶] and again what [M.B.] stated about [Q.S.'s] home."[6]

### 2. Legal principles.

"When a witness's volunteered statement is not attributable to either party, a mistrial is called for only if the misconduct is so inherently prejudicial as to threaten defendant's right to a fair trial despite admonitions from the court. [Citation.] "'Whether a particular incident is incurably prejudicial is by its nature a speculative

---

[6] It appears the jury was interested in what Detective Faylor, not M.B., stated about Q.S.'s home because M.B. did not testify about it or its location. However, Detective Faylor had interviewed Q.S. at his apartment, and the detective testified about the location of the apartment complex in relation to the location of the victim's apartment.

matter, and the trial court is vested with considerable discretion in ruling on mistrial motions. . . .' [Citation.] A motion for a mistrial should be granted when ""'a [defendant's] chances of receiving a fair trial have been irreparably damaged."""" (*People v. Molano* (2019) 7 Cal.5th 620, 675-676.) "Ordinarily, a curative instruction to disregard improper testimony is sufficient to protect a defendant from the injury of such testimony, and, ordinarily, we presume a jury is capable of following such an instruction." (*People v. Navarrete* (2010) 181 Cal.App.4th 828, 834 (*Navarrete*).) "It is only in the exceptional case that 'the improper subject matter is of such a character that its effect . . . cannot be removed by the court's admonitions.'" (*People v. Allen* (1978) 77 Cal.App.3d 924, 935 (*Allen*).) We review the ruling on a motion for a mistrial for abuse of discretion. (See *People v. Valdez* (2004) 32 Cal.4th 73, 128.)

        *3. Analysis.*

Defendant contends Detective Faylor's testimony that M.B. said he "'was aware of the family involved *as well as the alleged shooter* at the time,' and that he '*was aware J Biggs had shot his own cousin the night before*,' suggested that someone, not [S.M.], told [M.B.] that [defendant] was the perpetrator and, thus, that [M.B.] had information, which was not available to the jury, establishing that [defendant] was, in fact, the perpetrator." He asserts this testimony "improperly corroborated and bolstered [S.M.'s] testimony that she was able to see [defendant] in the millisecond when the muzzle flash illuminated the area around the shooting and wholly undermined [defendant's] defense, which required the jury harbor a doubt as to whether [S.M.] could, in fact, see the shooter and accurately identify him as [defendant]." Defendant further contends this testimony

was so unduly prejudicial, it could not be cured by striking the statement and admonishing the jury. In support of his contentions, defendant relies heavily on *Navarrete*, *supra*, 181 Cal.App.4th 828; however, he also refers to *Allen*, *supra*, 77 Cal.App.3d 924 and *People v. Bentley* (1955) 131 Cal.App.2d 687 (*Bentley*), disapproved on another point in *People v. White* (1958) 50 Cal.2d 428, 430-431.

In *Navarrete*, the defendant was charged with committing a lewd act on a four-year-old. (*Navarrete*, *supra*, 181 Cal.App.4th at p. 830.) The trial court granted the defense motion to suppress any reference to defendant's confession that was obtained in violation of his *Miranda*[7] rights. (*Navarrete*, at p. 831.) Upset with the court's ruling, one of the detectives "promised he 'was going to show' the court." (*Id*. at p. 832.) During that detective's testimony, he was asked why he had decided against DNA testing on swabs taken from the victim's body. He replied, "'Well, for several reasons, the first of which it's a court rule that the defendant's statement is inadmissible. So I can't state the first reason.'" (*Id*. at p. 831.) The trial court struck the testimony and gave a curative instruction to the jury. (*Id*. at pp. 831-832.) The defendant was convicted and appealed. The appellate court reversed the judgment on the grounds the curative instruction was insufficient because the jury could have reasonably inferred from the detective's testimony that the defendant "had confessed or otherwise incriminated himself, rendering DNA evidence unnecessary." (*Id.* at p. 834.) The Court of Appeal found that the detective intentionally referenced the defendant's inadmissible prior statement because he

---

[7] *Miranda v. Arizona* (1966) 384 U.S. 436.

14

(the detective) intended to prejudice the jury against the defendant, and the detective's "misconduct more likely than not achieved the effect he sought." (*Id*. at pp. 836-837.) The appellate court further found the trial court's curative instructions could not undo the damage inflicted by the detective's testimony because the instruction "did not break the link the jury was likely to perceive between a 'statement' and a 'confession' in the context of other evidence the jury heard." (*Id*. at p. 834.)

In *Allen*, the defendant, charged with robbery, testified (along with his sisters) that he was elsewhere on the night in question. (*Allen*, *supra*, 77 Cal.App.3d at pp. 928-929.) The prosecution witnesses included a minor who was an accomplice and his mother. (*Id*. at p. 929.) The minor's mother testified that one of the defendant's sisters told her the defendant was "'on parole.'" (*Ibid*.) The trial court immediately struck the parole reference, and the jury was instructed to disregard it. (*Id*. at p. 934.) Following his conviction, the defendant appealed and argued that the trial court committed reversible error by denying his motion for mistrial based on the testimony that he was "'on parole.'" (*Id*. at p. 930.) The appellate court agreed, stating: "An examination of the record reveals an extremely close case in which the jury had to make its fact determination based upon the credibility of the [defendant] and his witnesses and on the credibility of the prosecution's witnesses." (*Id.* at p. 935.) The court thus found it was reasonably probable the outcome would have been more favorable to the defendant without the prejudicial information of his parole status. (*Ibid*.)

In *Bentley*, the defendant was convicted of committing lewd acts against a minor. (*Bentley*, *supra*, 131 Cal.App.2d at p. 688.) The investigating officer testified that the

15

defendant denied committing the alleged offenses but then volunteered, "'[a]nd I went on to question him about activities he had been involved in in 1942 when he had been a suspect in another case, and he denied this.'" (*Id*. at p. 689.) The trial court granted the motion to strike the volunteered statement and instructed the jury to disregard it, but the court denied a motion for mistrial. (*Ibid*.) The appellate court reversed the conviction after finding the trial court's curative admonishment was inadequate to address the prejudice caused by the officer's suggestion the defendant had engaged in prior similar conduct. (*Id*. at pp. 691-692.) The appellate court explained: "It is obvious from the record that the police officer deliberately made the statement about defendant being a suspect in another case in 1942 with the idea in mind of prejudicing defendant. There can be no doubt that the statement was highly prejudicial . . . and could not have been cured by the court's admonition." (*Id*. at p. 690.) The court noted that the statement effectively put the defendant in a position of defending himself against other similar misconduct. (*Id*. at p. 691.) Combined with another error (failure to give a cautionary instruction) that reinforced the jury's likelihood to improperly consider the defendant's prior arrest, the appellate court concluded the defendant had not received a fair trial. (*Id*. at pp. 691-692.)

Defendant argues his "case, like *Navarrete*, *Allen*, and *Bentley*, presents one of the exceptional circumstances that supports the granting of a mistrial because no other remedy could cure the prejudice [that] resulted from [Detective] Faylor's volunteered statements." We disagree. *Navarrete*, *Allen*, and *Bentley* are distinguishable. *Navarrete* acknowledged that "a trial court can almost always cure the prejudice of an improperly

volunteered statement by granting a motion to strike and charging the jury with an appropriate curative instruction," but that, in Navarrete's case, the reference to the inadmissible confession was an "'exceptional circumstance'" where a curative instruction could not undo the prejudice. (*Navarrete*, *supra*, 181 Cal.App.4th at p. 836.) Indeed, the court in *Navarrete* stated: "A jury's belief that a defendant may have confessed eviscerates the presumption of innocence." (*Id*. at p. 834.) This case does not involve the "'exceptional circumstance'" of a defendant's confession being improperly introduced. (See *id*. at p. 836.) The *Allen* court found the case to be "extremely close," such that it was reasonably probable that evidence of defendant's parole status tipped the credibility scale in favor of the prosecution's witnesses. (*Allen*, *supra*, 77 Cal.App.3d at p. 935.) Finally, the usefulness of the prejudice analysis conducted by the *Bentley* court is doubtful. The *Bentley* decision predated the statutory changes that made prior uncharged sexual offenses admissible under Evidence Code section 1108, subject to an Evidence Code section 352 balancing analysis. In concluding the defendant did not receive a fair trial, the *Bentley* court relied greatly on the harmful effect of alleged prior uncharged sexual offense evidence. (*Bentley*, *supra*, 131 Cal.App.2d at pp. 690-691.) Also, the harmful testimony in *Bentley*, like that in *Navarrete*, involved an intentional effort by a law enforcement witness to place prejudicial information about the defendant before the jury. (*Bentley*, at p. 690.)

Here, the volunteered statement did not involve a confession, defendant's parole status, or any alleged prior uncharged criminal acts. Rather, the statement concerned a statement provided by M.B.—an admitted PCP addict—to an investigating detective that

17

he (M.B.) "was *aware* that J Biggs had shot his own cousin the night before." (Italics added.) Defendant argues this statement "devastated" his mistaken identification defense by suggesting additional evidence established him as the perpetrator. Not so. Contrary to defendant's assertion, the jurors would not likely have *understood* the use of the word "aware" to mean that M.B. "had first-hand knowledge" of defendant's guilt, i.e., that defendant was, in fact, the shooter. The detective asked M.B. "*if he had* seen or *heard anything in the area from the night prior*." (Italics added.) M.B.'s replies indicated that he had "heard" there was a murder and who was involved. His specific reply that he "was *aware* that J Biggs had shot his own cousin the night before" did not unequivocally establish defendant's culpability or M.B.'s firsthand knowledge of any evidence of culpability. (Italics added.) The only thing M.B. witnessed was defendant "running . . . eastbound past his apartment complex" at "approximately" 10:15 p.m.

Moreover, there is no evidence Detective Faylor intended to prejudice the jury, as did the officers in *Navarrete* and *Bentley*. It was an isolated statement amidst a 10-day trial involving 20 witnesses. Acknowledging the brevity of the statement, defendant nonetheless argues that it was "incurabl[y] prejudicial" because it directly implicated him in the charged crime. We disagree. This was not a case in which the stricken statement stood out or dominated in the minds of the jurors when viewed against the entire record of admissible evidence. During deliberations, the jurors requested the following: (1) the 911 transcript; (2) S.M.'s testimony; (3) Detective Faylor's testimony regarding Q.S.;[8]

---

[8] See footnote 6.

18

(4) M.B.'s testimony; (5) Detective Faylor's first testimony on October 25, 2018 (regarding his interview of M.B.); (6) Detective Faylor's testimony about Q.S.'s home (again); (7) Detective Tebbetts' testimony; (8) defendant's mother's testimony; and (9) Sergeant Walker's testimony regarding J.T. The jurors also wanted to know when a photo was taken of defendant with his "dreds/twisties." The jurors did not focus on M.B.'s statement to the exclusion of defendant's alibi witnesses. Rather, they heard from several witnesses who placed defendant at the crime scene around the time of the shooting. Although defendant's alibi witnesses testified that defendant was at his parents' home, none accounted for his whereabouts during the crucial time window. Also, these witnesses changed their statements between their initial interviews and their trial testimony, and their new statements were inconsistent with each other.

Nor do we find that the jurors likely used the statement to directly corroborate S.M.'s eyewitness testimony that defendant was the perpetrator. According to defendant, M.B.'s statements identifying defendant as the perpetrator "eviscerated" the defense and "closed the evidentiary gap that was present at the first trial when five jurors found the prosecution had not proved its case beyond a reasonable doubt."[9] We disagree. As the People point out, if there was any part of M.B.'s statements to Detective Faylor that

---

[9] Defendant points out that his first jury trial on the charged offenses resulted in a hung jury, and the trial court declared a mistrial. His second jury trial resulted in a conviction. He attributes his conviction to the prosecution's decision to question Detective Faylor about M.B.'s statements that were made on the day after the shooting. According to defendant, the testimony regarding M.B.'s statements about knowing the shooter and identifying the shooter as defendant "filled the evidentiary gap which caused five jurors at the initial trial to harbor a doubt as to [defendant's] guilt."

19

swayed the jury in favor of conviction, it was his "eyewitness description of [defendant] running through the neighborhood immediately after the murder." In comparison to this definitive observation of defendant, M.B.'s *awareness* that defendant shot his cousin was ambiguous. Detective Faylor never testified that M.B. stated, "Defendant shot his cousin." Rather, he testified that M.B. said he was "*aware*" defendant "*had shot his own cousin the night before*." (Italics added.) The fact that a person is aware of, or knows about, a past event (such as a shooting) and the identity of the parties allegedly involved in the event (defendant & the victim) does not mean that he or she is validating its occurrence or the identity of the parties involved.[10]

More importantly, even without Detective Faylor's volunteered statement, other witnesses corroborated S.M.'s testimony, namely, Q.S. (who lived in the neighborhood), Detective Tebbetts, and J.T. (a jailhouse informant). Q.S. placed defendant in the area on the night of the shooting and wearing a black hooded sweater. Detective Tebbetts encountered defendant in September 2013 and described him as having "short dreadlock style hair," similar to his appearance on January 28, 2014. And, J.T. testified that defendant confessed to shooting a man three times and a woman twice in a Victorville apartment and said defendant told him he then cut off his dreadlocks.

In sum, given the brevity of the detective's objectionable statement, the trial court properly exercised its discretion in denying the motion for a mistrial, striking the

---

[10] In closing, defense counsel emphasized M.B.'s lack of information about the shooting by arguing: "[M.B.] had no information about the shooting itself. He wasn't there. He doesn't claim to have seen or heard anything."

statement, offering to provide a limiting instruction/explanation of its ruling reversing a prior evidentiary ruling, and forbidding either side from referencing it during closing argument.

## B. *Prosecutorial Error.*

Defendant contends the prosecutor erred[11] and improperly shifted the burden of proof by faulting defendant for failing to present evidence of an alternative suspect with a motive to kill the victim. Defendant's contentions lack merit.

### 1. *Further background information.*

At the beginning of the trial, the court instructed the jury that the defendant was "presumed to be innocent," and the prosecutor had to prove defendant's guilt "beyond a reasonable doubt." Before closing arguments, the court repeated these instructions. During closing, defense counsel reminded the jury that the prosecutor bears a "heavy burden" to prove guilt beyond a reasonable doubt while defendant is "draped" with the presumption of innocence. Defense counsel argued: "This case hinges on nothing more than a muzzle flash, a muzzle flash and an in-custody informant . . . . All the rest of it is just padding."

---

[11] "'[T]he term prosecutorial "misconduct" is somewhat of a misnomer to the extent that it suggests a prosecutor must act with a culpable state of mind. A more apt description of the transgression is prosecutorial error.'" (*People v. Centeno* (2014) 60 Cal.4th 659, 666-667.)

In response to defense counsel's argument, the prosecutor asserted that S.M.'s testimony is "corroborated by so many witnesses and so much evidence." After pointing out each witness who provided corroborating evidence, he argued: "But let's focus on what we don't have. We don't have any evidence of anyone else besides the defendant killing [the victim]. He's got something bigger coming his way or threatening [the victim]. We don't have any evidence of someone else with a motive. We don't have any evidence of somebody else who fled the crime scene, who fled the city, who fled the county. We don't have evidence of anybody else nam[ed] JB or J Biggs." Defense counsel objected: "That is an improper argument. The defense bears no burden to prove any of that." The trial court implicitly overruled the objection and offered to instruct the jury on reasonable doubt; defense counsel accepted the offer.

The prosecutor closed with the following: "There's no evidence of anyone else who fled. The defendant's the one who fled. The defendant is the one with the intent to kill [the victim]. The defendant is the one with the motive. The defendant is JB or J Biggs. The defendant cut off his dreadlocks in an attempt to change his appearance. The defendant bragged to another inmate about what he did in this case. The defendant's the one who had family and friends come in here and tell their story that couldn't even match up. The defendant did all of this because he's guilty. [¶] . . . Now it's your time to find a verdict that coincides with the evidence in this case. Now it's your time to find

the defendant guilty on all counts." The trial court reiterated the prosecutor's burden of proving defendant's guilt beyond a reasonable doubt.[12]

### 2. Legal principles.

A prosecutor has significant leeway during closing arguments to argue his or her case vigorously. (*People v. Stanley* (2006) 39 Cal.4th 913, 951.) He or she may comment "on the state of the evidence or on the defense's failure to call logical witnesses, introduce material evidence, or rebut the People's case are generally permissible. [Citation.] However, a prosecutor may not suggest that 'a defendant has a duty or burden to produce evidence, or a duty or burden to prove his or her innocence.'" (*People v. Woods* (2006) 146 Cal.App.4th 106, 112; see *People v. Bradford* (1997) 15 Cal.4th 1229, 1340.)

"'A prosecutor's conduct violates a defendant's constitutional rights when the behavior comprises a pattern of conduct so egregious that it infects "'the trial with unfairness as to make the resulting conviction a denial of due process.'"'" (*People v. Young* (2019) 7 Cal.5th 905, 932.) "'When a claim of misconduct is based on the

---

[12] "The fact that a criminal charge has been filed against the defendant is not evidence that the charge is true. [¶] You must not be biased against the defendant just because he's been arrested, charged with a crime, or brought to trial. [¶] A defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove a defendant guilty beyond a reasonable doubt. [¶] Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt. [¶] . . . [¶] In deciding whether the People have proven their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial. [¶] . . . [¶] In their closing arguments, the attorneys discussed the case, but their remarks are not evidence. You must decide what the facts are. It's up to all of you, and you alone, to decide what happened based only on the evidence that has been presented to you in this trial."

prosecutor's comments before the jury, "'the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.'"" (*People v. Rivera* (2019) 7 Cal.5th 306, 334.)

### 3. Analysis.

The record fails to establish prosecutorial error. Defendant accuses the prosecutor of telling "the jurors that the defendant had an affirmative duty to present evidence to overcome the prosecution's claim that he was the perpetrator of this pre-planned attack on [the victim] and [S.M.]" The prosecutor, however, never asserted that the defendant bore the burden of producing any evidence or proof of his innocence. Rather, he commented on the state of the evidence and on the failure of the defense to introduce material evidence or call logical witnesses. (*People v. Gomez* (2018) 6 Cal.5th 243, 299 [prosecution may comment upon the state of the evidence or upon the failure of the defense to introduce material evidence or to call anticipated witnesses]; see *People v. Bradford* (1997) 15 Cal.4th 1229, 1340 [observing that "[a] distinction clearly exists between the permissible comment that a defendant has not produced any evidence, and on the other hand an improper statement that a defendant has a duty or burden to produce evidence, or a duty or burden to prove his or her innocence"].) Such comments amount to nothing more than proper argument. They did not mislead the jury into believing that defendant had the burden of presenting evidence or that the prosecution was relieved of establishing each element of the crimes beyond a reasonable doubt. Moreover, the trial court properly instructed the jury that the prosecution bore the burden of proving defendant's guilt of the charged offenses beyond a reasonable doubt, and that the

arguments of counsel are not evidence, instructions we must presume the jury understood and followed.  (*People v. Cain* (1995) 10 Cal.4th 1, 34.)

C.  *CALCRIM No. 315.*

Defendant contends the trial court prejudicially violated his due process rights by instructing the jury with CALCRIM No. 315,[13] to consider the eyewitness's degree of certainty in evaluating the truthfulness and accuracy of S.M.'s identification testimony because the instruction lowers the prosecution's burden of proof by causing jurors to equate certainty with accuracy and denying defendant his meaningful opportunity to present a complete defense.  The People respond that, under our Supreme Court's decision in *People v. Sánchez* (2016) 63 Cal.4th 411 (*Sánchez*), defendant's claim of error is both forfeited for failure to object below and without merit.  Defendant concedes his counsel

---

[13]  The court instructed the jury with CALCRIM No. 315 as follows:  "You have heard eyewitness testimony identifying the defendant.  As with any other witness, you must decide whether an eyewitness gave truthful and accurate testimony.  [¶]  In evaluating identification testimony, consider the following questions:  [¶]  Did the witness know or have contact with the defendant before the event?  [¶]  How well could the witness see the perpetrator?  [¶]  What were the circumstances affecting the witness's ability to observe, such as lighting, weather conditions, obstructions, distance, and duration of observation?  [¶]  How closely was the witness paying attention?  [¶]  Was the witness under stress when he or she made the observation?  [¶]  Did the witness give a description and how does that description compare to the defendant?  [¶]  How much time passed between the event and the time when the witness identified . . . the defendant?  [¶]  Was the witness asked to pick the perpetrator out of a group?  [¶]  Did the witness ever fail to identify the defendant?  [¶]  Did the witness ever change his or her mind about the identification?  [¶]  *How certain was the witness when he or she made an identification?*  [¶]  Are the witness and the defendant of different races?  [¶]  Was the witness able to identify the defendant in a photographic or physical lineup?  [¶]  Were there any other circumstances affecting the witness's ability to make an accurate identification?  [¶]  The People have the burden of proving beyond a reasonable doubt that it was the defendant who committed the crime.  If the People have not met this burden, you must find the defendant not guilty."  (Italics added.)

raised no objection but asserts such failure is excusable because (1) the governing law "offered scant grounds for objecting," and (2) the California Supreme Court is "set to review, and possibly reverse, its previous holding[] in *Sánchez*."

After briefing was completed in this case, the Supreme Court issued its decision in *People v. Lemcke* (2021) 11 Cal.5th 644 (*Lemcke*), which affirmed its previous holding in *Sánchez*. (*Lemcke*, at p. 647.) Rejecting the defendant's due process claims, the court approved CALCRIM No. 315, including its certainty factor. (*Lemcke*, at pp. 655-661.) The court held, "the instruction does not direct the jury that 'certainty equals accuracy.' [Citation.] Nor does the instruction state that the jury must presume an identification is accurate if the eyewitness has expressed certainty. [Citation.] Instead, the instruction merely lists the witness's level of certainty at the time of identification as one of 15 different factors that the jury should consider when evaluating the credibility and accuracy of eyewitness testimony. The instruction leaves the jury to decide whether the witness expressed a credible claim of certainty and what weight, if any, should be placed on that certainty in relation to the numerous other factors listed in CALCRIM No. 315." (*Lemcke*, at p. 657.)

Notwithstanding, *ante*, the Supreme Court acknowledged that the form of CALCRIM No. 315 "has the potential to mislead jurors" given "the empirical research that '"under most circumstances, witness confidence or certainty is not a good indicator of identification accuracy."'" (*Lemcke*, *supra*, 11 Cal.5th at p. 665.) Thus, while the defendant "failed to establish that the trial court's decision to include the certainty factor in CALCRIM No. 315 violated his due process rights or otherwise constituted error under the

circumstances presented here[, the court recognized the] risk that the current version of the instruction will prompt jurors to infer that an eyewitness's certainty in an identification is generally a reliable indicator of accuracy." (*Lemcke*, at p. 669.) Thus, the court directed "trial courts to omit the certainty factor from CALCRIM No. 315 until the Judicial Council has the opportunity to consider how the language might be better worded to minimize juror confusion on this point." (*Ibid*.)

Here, defendant has also failed to establish that the inclusion of the certainty factor in CALCRIM No. 315 violated his due process rights or otherwise constituted error under the circumstances presented. Defendant challenged S.M.'s eyewitness identification through cross-examination and presented an alibi defense through the testimony of several witnesses. As previously noted, the jury was instructed that defendant was presumed innocent, and the prosecution bore the burden of proof. "In sum, when considered "'in the context of the instructions as a whole and the trial record'" [citation], we conclude that listing the witness's level of certainty as one of 15 factors the jury should consider when evaluating an eyewitness identification did not render [defendant's] trial fundamentally unfair or otherwise amount to a due process violation." (*Lemcke*, *supra*, 11 Cal.5th at p. 661.)

Even assuming, arguendo, that CALCRIM No. 315 violated defendant's due process rights, we conclude the error was harmless beyond a reasonable doubt considering the compelling evidence of his identity as the shooter. (See *Sánchez*, *supra*, 63 Cal.4th at pp. 462-463 [any error in instructing jury on eyewitness certainty was harmless beyond reasonable doubt, where "the eyewitness identifications were far from the only evidence

27

connecting defendant to the crimes"]; *id*. at p. 495 (conc. opn. of Liu, J.) [same].) The evidence shows defendant's appearance matched the shooter's physical description, including the shooter's hairstyle (dreadlocks) and clothing (black hooded sweatshirt). Witnesses placed defendant near the crime scene prior to the shooting, and he was seen running through the area afterward. After the shooting, defendant cut off his dreadlocks, and detectives later found him hiding in a house in Los Angeles. His alibi witnesses offered conflicting testimony regarding the events of the night of the shooting. On this record, there is no reason to believe the jury relied only on S.M.'s eyewitness certainty in convicting defendant. Moreover, eyewitness certainty was only one of 14 factors identified in CALCRIM No. 315. Defendant does not challenge the inclusion of factors concerning S.M.'s prior knowledge or contact with the perpetrator, which weighed in favor of the identification's reliability, as her testimony indicated she saw and interacted with defendant multiple times in the two months before she identified defendant as the shooter. We conclude beyond a reasonable doubt that the jury would have delivered the same verdicts even if the eyewitness certainty factor had been omitted from CALCRIM No. 315. (See *Sánchez*, *supra*, 63 Cal.4th at pp. 462-463.)

    *D. Cumulative Effect of Any Errors.*

    Defendant asserts the cumulative effect of the errors was prejudicial and requires reversal. We have assumed one error—the giving of CALCRIM No. 315—but it was not prejudicial. This claim thus lacks merit.

## III.  DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER
J.

We concur:


RAMIREZ
P. J.


MENETREZ
J.